## A10A2059. HINES v. THE STATE.
(706 SE2d 156)

ADAMS, Judge.
Michael Leon Hines was charged with two counts of child molestation and one count of enticing a child for indecent purposes for an incident involving his stepdaughter. Following a jury trial,

---

YALE LAW LIBRARY

Hines was convicted on one count of molestation. He contends the evidence was insufficient to support the verdict, that his trial counsel was ineffective, and that the trial court erred with regard to the chain of custody of certain evidence. We affirm.

Construed in favor of the verdict, the evidence shows the victim, B. B., was 12 years old at the time of the incident, and Hines, her stepfather, was 33. On December 20, 2004, while her mother was at work, B. B. and her younger stepbrother were playing and wrestling in their parents' room. When her brother left the room, Hines asked B. B. to give him a back massage, which she had done before. B. B. massaged Hines's back, legs, and feet. At one point B. B.'s brother returned and helped with the massage, but Hines eventually told the young boy to leave. B. B. then went into a light sleep on the bed. In a statement that she made on the day of the incident, B. B. stated, "I was in a light sleep but I heard him and like five minutes later I felt his penis in my rear end and he woke me up and I was pretending to be asleep because I was scared." She told a police officer that she soon felt a liquid on her buttocks and that Hines got a washcloth and attempted to clean her up. At trial, when asked about the details of the incident, she claimed not to recall, and she testified, "I don't remember honestly, I've tried to put this situation behind me." But she admitted she signed a statement at the time and that the statement was hers. She also made a statement that Hines pulled down her pants and underwear before the incident. She remembered having to pull her pants up. Afterward, she called and left a message for her mother, then called a friend, and went to her friend's home taking her stepbrother along.

When B. B.'s mother returned the call, either B. B. or her friend said that there was an emergency and that she had to come home because Hines had touched B. B. B. B.'s friend testified that B. B. told her at the time that Hines "was having sex with her from behind and she said she woke up but she just pretend[ed] like she was asleep because he [owned] weapons." Later, B. B. told her mother that Hines had raped her. B. B.'s mother took her to the hospital for an examination.

At the hospital, a doctor performed a full physical examination. He discovered secretions on the victim's body in both the vaginal and perineal areas of the victim, as well as evidence of another foreign material that he described as a K-Y jelly like substance. In the opinion of the doctor, the location of the secretions on the victim's body ruled out the possibility that the source could be simple contact with sheets contaminated with the same secretions. The secretions isolated from the child's body, which were stored in a sexual assault kit, were tested and shown to contain the DNA profiles of both Hines and the victim. Finally, the victim told the doctor essentially the

same version of the facts as given in her statement to the police.

1. Hines contends the evidence was insufficient to support the verdict because the DNA identification evidence was fatally flawed. The crime lab employee who testified about the sexual assault kit and the testing of the material, testified that the kit contained five slides, or "smears," of material to be tested and that one was labeled "vaginal cervical," two were labeled "rectal," and two were labeled "perineal." She also testified that the results showed a match with Hines's DNA on the "vaginal cervical swab" of the child. Hines points out that the doctor who performed the examination did not testify that he took a sample from the "vaginal cervical area." But the doctor testified that he took the material from the "patient's perianal area, and also the sub-pubic area which means right above the vaginal area," as well as in the "perilabial area," which is the outer portion of the vagina. And, as is further shown below, other evidence was presented to show that the tested sexual assault kit was the same kit the doctor prepared with the material that he obtained from the victim. Also, the crime lab employee, who was not present when the swab was taken, testified that the doctor would be the person who could say where the samples came from. Based on the evidence, the jury was authorized to conclude that the tested material came from the child.

Hines also contends the victim's various statements were inconsistent and unreliable. But in general, the statements show consistency, and the victim admitted that she gave a written statement to the police that was, in fact, her statement. Furthermore, "[i]t is the role of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient. [Cit.]" *Brooks v. State*, 281 Ga. 514, 516 (1) (640 SE2d 280) (2007).

The evidence was sufficient to convict Hines of child molestation. See OCGA § 16-6-4 (a); *Watson v. State*, 222 Ga. App. 814, 816 (3) (476 SE2d 96) (1996) (evidence that defendant rubbed the victim's vagina through her clothing was sufficient to convict defendant of child molestation). See also *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Hines contends the trial court erred in overruling his chain of custody objection to the admission of the sexual assault kit into evidence. The chain of custody rule concerns itself with fungible evidence:

> To show a chain of custody adequate to preserve the identity of fungible evidence, the State must prove with reasonable certainty that the evidence is the same as that seized and that there has been no tampering or substitution. The State

is not required to foreclose every possibility of tampering; it need only show reasonable assurance of the identity of the evidence.

(Citations, punctuation and footnotes omitted.) *Maldonado v. State*, 268 Ga. App. 691-692 (1) (603 SE2d 58) (2004). Like other questions regarding the admission of evidence, "[w]e review the trial court's decision on the adequacy of the chain-of-custody evidence under an abuse-of-discretion standard." Id.

We find no abuse of discretion. First, Hines admits there is no affirmative evidence of tampering.[1] He also admits there was no chain of custody problem regarding the kit from the time it was collected at the hospital until it was in the custody of the Georgia Bureau of Investigation ("GBI"). Hines contends, however, that there is a break in the chain of custody because the kit was sent to a laboratory in New Orleans for testing and no one from the lab in New Orleans testified. But the simple fact "that one of the persons in control of a fungible substance does not testify at trial does not, without more, make the substance or testimony relating to it inadmissible." (Citations and punctuation omitted.) *Gassett v. State*, 289 Ga. App. 792, 795 (3) (658 SE2d 366) (2008).

The evidence shows that at the hospital, a nurse gave the sexual assault kit to an investigating officer. The kit was then taken to the state crime lab. There, the GBI sealed the bag containing the kit, labeled it "2005-1000551," marked it with the analyst's initials and a bar code, and, on May 31, 2005, sent the kit to Reliagene, a private laboratory in New Orleans, to test for the presence of "seminal fluid or sperm." Reliagene returned the entire kit to the GBI on February 22, 2006. At trial, the kit was shown to have the same identification number and bar code, and it had the initials of the GBI analyst who worked on the case. Thus, the kit itself, as marked, was not fungible and the witness testified to its identification. "In contrast to fungible evidence, if a piece of tangible evidence is a distinct item that could be recognized from its features from someone who saw it before, that person's testimony identifying the item is sufficient to authenticate it." (Punctuation and footnote omitted.) *Phillips v. Williams*, 276 Ga. 691, 692 (583 SE2d 4) (2003). See *Roberts v. State*, 232 Ga. App. 745, 748 (6) (503 SE2d 614) (1998) (item — back seat of car and results of tests for semen on the back seat of the car — not fungible).

Reliagene returned the kit with the samples, as well as a report showing that one of the samples contained sperm. After it received

---

[1] "Where there is only a bare speculation of tampering it is proper to admit the evidence and let whatever doubt remains go to its weight." (Citations and punctuation omitted.) *Thomas v. State*, 288 Ga. App. 602, 606 (2) (654 SE2d 682) (2007).

the kit, the GBI also concluded the same sample contained sperm, and it then compared the DNA found in that sample with DNA taken from the defendant's mouth, which is called a buccal swab. The DNA in the two samples matched.

"DNA, like a fingerprint, is unique to a single individual and, therefore . . . may be admitted without demonstrating a chain of custody, since it can be readily identified by reference to the defendant's DNA." (Footnotes omitted.) *Kuykendall v. State*, 299 Ga. App. 360, 364 (683 SE2d 56) (2009). Thus, under the circumstances of this case, Hines's complaint about the swab samples sent to Reliagene does not raise a chain of custody issue, per se. The real issue is the possibility of mishandling or contamination of the material in the sexual assault kit with another source of Hines's DNA. See *Thomas v. State*, 288 Ga. App. 602, 606 (2) (654 SE2d 682) (2007). But no evidence was produced to show that there could be such a possibility prior to the time that the material was returned from Reliagene — the first point in time when the material taken from the victim was in the same location as the buccal sample taken from Hines's mouth. No evidence was presented to suggest that the buccal swab was sent to New Orleans nor to show that Reliagene, or the doctor who took the swabs from the victim, had access to any of Hines's sperm from any other source. Nor was any evidence presented to suggest the sample returned from Reliagene was mishandled or contaminated upon return to the GBI. "Whatever doubt may have arisen from the alleged mishandling of evidence in this specific case could have been argued to, and considered by, the jury, and the jury is charged with deciding how much weight to give evidence." (Citations and punctuation omitted.) Id. (not error to admit DNA results over chain of custody objection even though sample had been sent to a private lab in New Orleans for testing and no witness testified about custody of the sample at that lab).

3. Hines contends his trial counsel was ineffective by failing to object to the DNA evidence. The part of Hines's claim that is based on his argument regarding chain of custody of the sexual assault kit is without merit for the reasons stated above. His remaining arguments are that counsel should have objected to the DNA evidence because (1) the State failed to lay a foundation under the business records exception; (2) the test results were not certified; (3) no foundation was given for any aspect of Reliagene's testing; and (4) the documents contained inadmissible evaluations, opinions and conclusions of third parties not before the court. Hines argues that these failures violated his right to confrontation under the Sixth Amendment and his rights to due process and a fair trial.

To show ineffective assistance, a criminal defendant must show both that his counsel's performance was deficient, and but for

counsel's unprofessional errors, there is a reasonable probability that the outcome of the trial would have been different. *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). Upon review of a trial court's ruling on the effectiveness of trial counsel "we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." (Citations and punctuation omitted.) *Suggs v. State*, 272 Ga. 85, 88 (4) (526 SE2d 347) (2000).

At the hearing on the motion for new trial, Hines's trial counsel testified about several aspects of his representation of Hines. But, Hines's new counsel did not ask any questions about, nor did trial counsel testify about, why he chose not to object to the DNA evidence on the grounds now argued on appeal. Consequently, trial counsel's failure to object to the DNA evidence is presumed to be strategic:

> Without such testimony, in the absence of other evidence that trial counsel's performance was deficient, the trial court is to presume that trial counsel's actions are part of trial strategy. In the absence of trial counsel's testimony, it is extremely difficult to overcome this presumption.

(Citations and punctuation omitted.) *Temple v. State*, 253 Ga. App. 606, 609 (2) (a) (561 SE2d 132) (2002).

Here, Hines has not overcome the presumption that his trial counsel's failure to object on the grounds now asserted was strategic. First, all of the testimony regarding the DNA testing was supplied by Investigator Connie Pickens, an assistant manager of the biology section of the GBI crime lab, who did not perform any of the initial testing herself. Rather, Pickens was the direct supervisor to Allen Dixon, the GBI employee who actually performed the DNA tests but who no longer works for the GBI. Pickens testified that upon receiving the Reliagene report that found evidence of sperm in the sample, a qualified GBI DNA scientist would have performed a "peer review" of those results before proceeding to DNA testing, as a normal part of his procedure. She also personally reviewed the results submitted by Reliagene, as well as their notes and a photograph of the sample at issue. She then described the GBI's DNA analysis procedure in detail and testified that it was a method generally accepted in the scientific, medical, and academic communities for analyzing DNA. She testified that part of the procedure for comparing the DNA is called "P. C. R.," which appears to be the same method that has already been found valid in Georgia. See, e.g., *Thrasher v. State*, 261 Ga. App. 650, 651 (1) (c) (583 SE2d 504) (2003).

Pickens, who was admitted as an expert in the area of forensic

biology, reviewed all the work that Dixon had done to test the sample returned from Reliagene. She had access to all of the data generated during his analysis, Dixon's notes, and the ensuing reports. She also had work sheets showing that Dixon had followed GBI testing protocol. She examined all of the information, as well as the controls he had run that ensure validity of the data. She then reviewed the data obtained from the samples taken from the buccal swab and the sexual assault kit and drew her own opinion or conclusion regarding the results. "An expert may base her opinions on data gathered by others. [Cit.]" *Watkins v. State*, 285 Ga. 355, 358 (676 SE2d 196) (2009). She concluded that the two samples matched, just as Dixon had concluded. See also *Rector v. State*, 285 Ga. 714, 716 (4) (681 SE2d 157) (2009) (opinion of toxicologist admissible where toxicologist reviewed the work of report's original author and reached the same conclusions regarding test of blood samples); *Carolina v. State*, 302 Ga. App. 40 (690 SE2d 435) (2010).

Thus, Pickens's testimony was admissible. Although the testing reports prepared by others may not have been admissible given that the author of the reports did not testify, see *Carolina*, 302 Ga. App. at 42, it may be that trial counsel determined that the reports themselves were, in essence, cumulative of Pickens's testimony. Hines passed up the opportunity to question trial counsel on this point at the hearing on the motion for new trial. Accordingly, Hines has not overcome the presumption that his trial counsel's failure to object was strategic. Furthermore, Hines has not shown how introduction of these reports would have changed the outcome of the trial given that Pickens's testimony was admissible.

For all of the above reasons, the trial court properly denied Hines's motion for new trial.

*Judgment affirmed. Smith, P. J., and Mikell, J., concur.*

DECIDED FEBRUARY 11, 2011 — 

*Axam Roberts, Cinque M. Axam*, for appellant.
*Tracy Graham-Lawson, District Attorney, Anece Baxter White, Assistant District Attorney*, for appellee.